## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**STEVEN RICHARD TAYLOR,**

    Plaintiff,

    v.                           CASE NO.  3:26-cv-469

**RICKY D. DIXON,**
Secretary, Department of Corrections,
    in his official capacity;

**RANDALL POLK,** Warden,
    Florida State Prison,
    in his official capacity,

    Defendants.

_____

## 42 U.S.C. § 1983 COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

### I.      NATURE OF ACTION

1.    There is something wrong with the implementation of Florida's lethal injection protocol. Plaintiff Steven Taylor, a warrant-eligible inmate on Florida's death row, knows this because over two months ago, another Florida inmate initiated a federal lawsuit against Defendants based on alarming records showing that, over the course of the unprecedented number of Florida executions in 2025, corrections officials deviated from their written three-drug protocol on numerous occasions,

1

using expired drugs, lower dosages of drugs than required, and unauthorized drugs. *Walls v. Dixon,* No. 4:25-cv-0488, ECF 1 (N.D. Fla. Nov. 26, 2025).

2.      Since then, despite being on notice of the violations, Defendants have continued executions at the same grueling pace, without acknowledging the maladministration or taking any semblance of accountability.

3.      Defendants' refusal to explain the *Walls* records is particularly puzzling because it was Defendants who released the information through a public records request. Yet, as soon as the documented deviations from the protocol were raised in court, Defendants stopped providing any further information, refused to explain the disturbing errors, and continued executions without any pause or review.

4.      When Mr. Taylor sought updated records to further investigate the protocol violations, Defendants changed their approach to records requests entirely, categorically denying all requests pertaining to how executions are carried out. Because Defendants' narrow interest in secrecy does not outweigh Mr. Taylor's Eighth Amendment protections, this broad overstep violates federal law.

5.      Defendants' newfound interpretation of Florida's secrecy statute is particularly extreme because it contradicts their prior adherence to public records exceptions, as evidenced by the records it provided in *Walls*. The categorical denial of records on the basis that the secrecy statute prevents such disclosure is disingenuous considering the discovery Defendants have been ordered to provide to

other plaintiffs in an ongoing facial challenge to the constitutionality of Defendants' lethal injection protocol. *See* Order, *Brant v. Palmer*, *et al.*, No. 3:13-cv-412-MMH-SHJ (M.D. Fla. Jan. 2, 2024) (granting in part plaintiffs' motions to compel and ordering the production of various execution-related information). Yet, while that separate challenge to the protocol itself plods forward slowly, Defendants have opted to continue carrying out as many executions as possible behind a veil of secrecy and without following their own written protocol.

6.      Defendants' violations have already caught the attention of the United States Supreme Court. In a recent statement concerning another Florida prisoner's challenge to the administration of the lethal injection protocol, Justice Sotomayor expressed grave concern about the "Catch-22" that prisoners like Mr. Taylor face in light of the documented maladministration and Defendants' refusal to provide any information. *Trotter v. Florida*, 607 U.S. --, No. 25-6853, 2026 WL 504237 (Mem) *1 (Feb. 24, 2026) (Sotomayor, J., respecting the denials of the application for stay of execution and petition for certiorari). As observed by Justice Sotomayor, "[b]y continuing to shroud its executions in secrecy, Florida undermines both the integrity of its own execution process and, potentially, this Court's ability to ensure the State's compliance with its constitutional obligations." *Id.* at *2.

7.      Mr. Taylor challenges the constitutionality of the impediments put in place by Defendants to deprive him of the information that would be necessary to

establish an Eighth Amendment lethal-injection challenge. Defendants'
impermissibly broad interpretation of Florida's secrecy statute, which began only
after the publication of records showing their repeated maladministration of the
established protocol, "undermines both the integrity of its own execution process
and, potentially, this Court's ability to ensure the State's compliance with its
constitutional obligations." *Id.* at *2.

## II.    PARTIES TO THE COMPLAINT

### A.    Plaintiff

8.    Mr. Taylor is a death-sentenced inmate at Union Correctional
Institution in Raiford, Florida, under the custody of Defendant Dixon. Mr. Taylor is
a resident of the State of Florida, and is death-warrant eligible.

### B.    Defendants

9.    Defendant Dixon is the Secretary of the Florida Department of
Corrections ("DOC"). As Secretary, Defendant Dixon is responsible for the
promulgation and enforcement of policies and procedures generally applicable to all
Florida prisons and prisoners, and in particular the procedures and protocols related
to executions by lethal injection. App. A. He is sued in his official capacity.

10.    Defendant Dixon is required to review Florida's lethal injection
procedure every two years, at a minimum, and certify to the Governor that DOC is

"adequately prepared to carry out executions by lethal injection." *Id.* at 14. Defendant Dixon's last review and certification was February 18, 2025. *Id.* at 1.

11.    Defendant Polk is the Warden of Florida State Prison in Raiford, Florida. His facility is the location where the lethal injection protocol is administered, and where the lethal injection records are produced and maintained. He is sued in his official capacity.

12.    As noted in the lethal injection protocol, both Defendants have a duty to ensure that executions are carried out in a manner consistent with "evolving standards of decency" and not in violation of the Eighth Amendment. *Id.*

### III.    JURISDICTION AND VENUE

**A.    Jurisdiction**

13.    This action arises under federal statute and presents a federal question within this Court's jurisdiction under Article III and 28 U.S.C. §§ 1331 and 1343(a)(3). This action is brought pursuant to 42 U.S.C. § 1983. This Court has the authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201(a) and 2202, and Federal Rule of Civil Procedure 65.

**B.    Venue**

14.    The Middle District of Florida is an appropriate venue for this action. Mr. Taylor is incarcerated in this district under the custody of Defendant Dixon. Furthermore, Mr. Taylor's death sentence was imposed in this district, and

Defendants administer lethal injections in this district. Defendants' repeated protocol maladministration has therefore also occurred in this district, and the pertinent records reflecting those errors are created and maintained here.

## IV.　FACTUAL BACKGROUND

### A.　Defendants' noncompliance with the execution protocol.

15.　The lethal injection protocol calls for the rapid succession of a 200-milligram injection of etomidate, a sedative, followed by 1000 milligrams of rocuronium bromide, a paralytic agent, and 240 milliequivalents of potassium acetate, which stops the heart. App. A at 6-7.

16.　On February 18, 2025, Defendant Dixon certified DOC's ability to adequately carry out the lethal injection protocol. *Id.* at 1. In so doing, Defendant Dixon assured that "the entire process of execution should be transparent." *Id.*

17.　In November 2025, Florida inmate Frank Walls initiated a 42 U.S.C. § 1983 action against Defendants alleging, among other things, that DOC's repeated failure to follow its lethal injection protocol exacerbated the substantial risk of a painful death posed by his underlying medical conditions. *Walls,* No. 4:25-cv-0488, ECF 1 (N.D. Fla. Nov. 26, 2025).

18.　Walls presented DOC's partially redacted internal execution drug logs, which were maintained by Defendant Polk and provided by Defendant Dixon through a public records request. The records revealed a pattern of maladministration

throughout 2025, including the repeated administration of expired drugs, incorrect dosages of drugs, and drugs not authorized by the protocol at all. App. B.

19.     The logs indicate that DOC administered expired etomidate—with a January 31, 2025, expiration date—to Kayle Bates, executed on August 19, 2025; Curtis Windom, executed on August 28, 2025; David Pittman, executed on September 17, 2025; and Victor Jones, executed on September 30, 2025. App. B at 25.

| | | | | | |
|---|---|---|---|---|---|
| 8/19/25 | | | 1/31/2025 | –10 | 290 |
| 8/29/25 | | | 1/31/2025 | –10 | 280 |
| 9/17/25 | | | 1/31/2025 | –10 | 270 |
| 9/30/25 | | | 1/31/2025 | –10 | 260 |

This was in direct violation of Florida's lethal injection protocol. App. A at 6.

(6)   **Purchase and Maintenance of Lethal Chemicals:**  A designated execution team member will purchase, and at all times ensure a sufficient supply of, the chemicals to be used in the lethal injection process.  The designated team member will ensure that the lethal chemicals have not reached or surpassed their expiration dates.  The lethal chemicals will be stored securely at all times as required by state and federal law.  The FDLE agent in charge of monitoring the preparation of the chemicals shall confirm that all lethal chemicals are correct and current.

20.     DOC also documented inappropriate dosages of drugs during multiple executions. On June 25, 2025, a date corresponding to the execution of inmate Thomas Gudinas, the inventory logs show 10 x 10ml vials of rocuronium bromide were removed (1000mg), suggesting that DOC only prepared half of the required second drug, in violation of the protocol, which requires 2000mg arranged in 20 x 10ml vials. App. B at 7.

| 6/12/25 | | JUN 2025 | | − 10 | 530 |
| 6/12/25 | | 3/2026 | | − 10 | 520 |
| 6/25/25 | | 3/2026 | | − 10 | 510 |
| 7/16/25 | | 3/2026 | | − 20 | 490 |

21.    On June 12, 2025, a date seemingly corresponding to Anthony Wainwright's June 10, 2025, execution, records show that seven vials of potassium acetate were removed from DOC's inventory. This suggests that DOC prepared only 280 milliequivalents of potassium acetate, in violation of the protocol, which requires 480 milliequivalents (12 x 20ml vials). App. B at 5.

| 5/1/25 | | 10-2025 | | − 12 | 277 |
| 5/15/25 | | 10-2025 | | − 12 | 265 |
| 6/12/25 | | 10-2025 | | − 7 | 258 |

22.    And, at times, DOC implements a four-drug protocol beyond what is authorized in the current method. The logs show that, during the executions of Edward James and Michael Tanzi, DOC administered lidocaine, a drug not authorized by the protocol. This again indicates a level of improvisation and unpredictability beyond what is permitted. App. B at 15.

| DRUG NAME Lidocaine Hcl 1% 10mL | | | PACKAGE SIZE 25 x/10mL | | | |
| NDC# | | | | | | |
| DATE | INVOICE NAME/# | LOT # | EXP. DATE | MFR | RECEIVED/USED (+/−) | BALANCE |
| 1-3-2025 | | | Sep 2026 | | +25 | 25 |
| 3/20/25 | | | Sep 2026 | | − 2 | 23 |
| 4-08-25 | | | Sep 2026 | | − 2 | 21 |

23.    Dr. Joel Zivot, M.D., the medical expert in *Walls*, reviewed the records and expressed concern that the errors contained within posed severe risks to

prisoners who may be executed by the current reckless approach. From over 30 years of medical experience spanning the treatment of over 50,000 patients, Dr. Zivot attests that "[i]t is critical to properly monitor the storage of drugs, when they are being dispensed, and the quantities dispensed." App. C at ¶ 5. This is because "[w]henever pharmaceuticals are being administered, timing, quantity, and quality of the drug matter. These errors are significant and also contribute to the substantial likelihood of a drawn-out, torturous death." *Id.* at ¶ 7.

24.    In light of Defendants' repeated failure to acknowledge or rectify their mistakes, Dr. Zivot concluded that "[DOC] has demonstrated no capacity to understand the critical implications of these occurrences." *Id.* at ¶ 5. Based on his experience working as an expert in other executing states, Dr. Zivot concluded that "A well-functioning DOC would have intervened with corrections if similar errors in the administration of an execution protocol surfaced." *Id.* at ¶ 12.

25.    Troublingly, Dr. Zivot connected the errors reflected in the *Walls* records to multiple recent executions. For example, on November 13, 2025, Bryan Jennings was subjected to a "drawn-out, torturous execution" that lasted nearly 20 minutes. *Id.* at 9. Jennings was observed moving well into the execution, when movement is not expected—a sign that indicates a problem with the administration of drugs, and distress. *Id.* Yet, Defendants' refusal to provide any additional

information regarding the implementation of the protocol prevents any explanations from being discovered.

26.    The DOC records filed in *Walls* span through September 30, 2025. To date, a complete set of logs for all 19 executions carried out in 2025 has been withheld, with Defendants claiming the records are subject to total secrecy.

27.    There is every indication that these problems are extending into 2026 and will continue to repeat. For example, the most recent execution of Billy Leon Kearse on March 3, 2026, extended over 24 minutes. While Kearse was observed twitching and moving after the drugs were first injected, another 15 minutes passed before Kearse was declared dead. Freida Frisaro, ASSOCIATED PRESS (Mar. 3, 2026); https://apnews.com/article/florida-execution-billy-leon-kearse-desantis-3eef0267677a5ae99313aaeed8a40654. While Defendants have not provided any explanation about the source of the anomalies, Dr. Zivot concludes that "the drawn-out nature of Mr. Kearse's execution could be attributed to [Defendants'] errors in administration of the protocol. However, absent additional information, there is no way of knowing why the process took so much longer than it should have." *Id.* at ¶ 10.

**B.    Defendants' retaliatory suppression of lethal injection records.**

28.    On November 3, 2025, Mr. Taylor's counsel requested public records from the Florida Department of Law Enforcement ("FDLE")[1] and DOC pursuant to Florida Statute Chapter 119. App. D.

29.    From DOC, counsel sought inventory logs for the receipt of, request for, or disposal of lethal injection drugs used by DOC for the purpose of executions, any and all public and internal lethal injection protocols, and invoices and records pertaining to the purchase and acquisition of drugs used in lethal injection. App. D at 1. The scope of the records requested was limited to the past six months preceding the request—a time frame that would span from May to November of 2025—a period of time that had already been disclosed in the records published in *Walls*. *Id.*

30.    On January 21, 2026, Defendant Dixon denied Mr. Taylor's request outright, claiming a blanket exemption under the secrecy statute, Fla. Stat. § 945.10, and alleging that "there are no responsive records to produce that would not be entirely redacted." App. E. This contradicts the very existence of the *Walls* records,

---

[1] From FDLE, counsel sought execution monitor's logs and notes from the executions of Anthony Wainwright on June 10, 2025, Michael Bell on July 15, 2025, Kayle Bates on August 19, 2025, Curtis Windom on August 28, 2025, and Victor Jones on September 30, 2025. This request was narrowly tailored and identified only the executions with significant errors in administration, such as inappropriate dosages and dosages of expired drugs. App. D at 3-4. To date, no response has been received from FDLE.

which, as noted above, covered a period of time specified in Mr. Taylor's request and were redacted in accordance with the secrecy statute but nonetheless responsive.

31.    The records requests specified that if documents are denied in part or whole, Defendant Dixon should identify which exemptions are claimed. Further, counsel requested that Defendant Dixon include an itemized inventory and factual justification for the denial of any documents. App. D at 2. DOC did not comply with this portion of the request.

32.    On February 13, 2026, counsel for Mr. Taylor sought clarification regarding Defendant Dixon's denial of public records, seeking the particular statutory exemptions claimed for each passage or document denied. App. F at 1. In response, on March 2, 2026, Defendant Dixon, through counsel, sent another letter claiming a blanket exemption for all the records requested. *Id.* at 3. The response failed to connect the particular exceptions claimed to the specific information sought. *Id.* The letter also added that, "to the extent that [counsel is] seeking these records in furtherance of any litigation in which the Department is a represented party or third party, contacting our records unit without going through counsel is an ethics violation." *Id.*

33.    At the same time, in response to the records filed in *Walls*, other inmates scheduled for execution raised concerns in state courts that their execution under the current approach to administering Florida's lethal injection protocol violates the

Eighth Amendment. Those inmates sought records in state circuit courts pertaining to the maladministration of the lethal injection protocol, supported by the blatant violations reflected in the *Walls* records. *See State v. Heath,* Case No. 01-1989-CF-003026-A, Eighth Judicial Circuit, Alachua County, "Defendant's Demand for Additional Public Records- Florida Department of Corrections" (Jan. 13, 2026)*; State v. Trotter,* Case No. 86-CF-001225-A, Twelfth Judicial Circuit, Manatee County, "Defendant's Demand for Additional Public Records-Florida Department of Corrections," (Jan. 27, 2026); *State v. Kearse*, Case No. 91-136-CF, Nineteenth Judicial Circuit, St. Lucie County, "Defendant's Demand for Additional Public Records From Department of Corrections," (Feb. 3, 2026); *State v. King*, Case No. 2008-CF-001087, Twelfth Judicial Circuit, Sarasota County, "Defendant's Demand for Additional Public Records-Florida Department of Corrections ("FDOC")" (Feb. 17, 2026).

34.    Despite having itself provided the records that provided the factual basis for those claims, Defendants blocked any further factual development in each case, and denied the violations raised in the records. To justify this refusal, Defendants relied on an impermissibly broad interpretation of the secrecy statute, designed to protect the identity of "any person or entity that participates in, has participated in, or will participate in an execution…." Fla. Stat. § 945.10(1)(j). Despite the fact that the records had been produced in a redacted format just a few

months prior, consistent with their original interpretation of the secrecy statute,
Defendants relied entirely on the narrow language of the secrecy statute in its
categorical denial of records.

35.    Defendants have adhered to this statute in the past by providing records
with information pertaining to invoices, lot numbers, and the manufacturer redacted
to prevent the disclosure of the protected information. By way of example, the
attached invoice was included in the records disclosed in the *Walls* litigation, and
subsequently relied on in succeeding litigation:



App. B at 40; *Walls,* No. 4:25-cv-0488, ECF 1-1 at 80 (N.D. Fla. Nov. 26, 2025); *Heath v. State*, 2026 WL 320522 (Fla. Feb. 3, 2026); *Trotter v. State*, 2026 WL 444544 (Fla. Feb. 17, 2026).

36.    The disclosure of the execution logs in *Walls* did not result in the discovery of drug sources or the identity of executioners, the prevention of which was the reason the secrecy statute was originally enacted. *See, e.g., Bucklew v. Precythe,* 587 U.S. 119, 125 (2019) (explaining that states have an interest in keeping the identity of drug suppliers secret to prevent abolitionists from interfering and causing drug shortages). Properly redacted, the records Mr. Taylor seeks need not expose those secrets either. Yet, to date, no explanation has been provided for the clear usage of expired etomidate, incorrect dosages of drugs, or the usage of unauthorized drugs. Defendants have yet to explain how providing such an explanation, particularly when it has proven the records to be easily redacted or otherwise protected in the past, would result in the discovery of such information.

## V.    CAUSE OF ACTION

**The Eighth and Fourteenth Amendments prohibit Defendant from claiming total secrecy regarding all records relating to Florida's documented, repeated maladministration of its lethal injection protocol.**

37.    The Eighth Amendment's prohibition against cruel and unusual punishment forbids methods of execution that present "a substantial risk of significant harm." U.S. Const. Amend. VIII; *Glossip v. Gross*, 576 U.S. 863, 877

(2015); *Baze v. Rees*, 553 U.S. 35, 50-52 (2008); *see also in re Kemmler*, 136 U.S. 436, 447 (1890) ("Punishments are cruel when they involve torture or lingering death.").

38.    Where an Eighth Amendment claim alleges the risk of future harm, "the conditions presenting the risk must be '*sure or very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent* dangers.'" *Baze*, 553 U.S. at 50 (quoting *Helling v. McKinney*, 509 U.S. 25, 33, 34-35 (1993))).

39.    In the lethal injection context, this high evidentiary standard necessarily relies upon certain information that is specific to that state's department of corrections. For example, the standard requires an inmate to show an objectively intolerable risk of harm *that prevents prison officials from pleading that they were subjectively blameless* for purposes of the Eighth Amendment. *Id.* (emphasis added). Moreover, an inmate must also identify "a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the state has refused to adopt *without legitimate penological reason*." *Bucklew*, 587 U.S. at 134 (citing *Glossip,* 576 U.S. at 868-878; *Baze,* 553 U.S. at 52) (emphasis added).

40.    Despite there being a serious issue with the implementation of the lethal injection protocol as exemplified by the *Walls* records, Florida courts have found the records, standing alone, insufficient to meet the standard articulated in *Baze*, and

Defendants have thwarted further evidentiary development. *See Heath v. State,* SC2026-0112, 2026 WL 320522 at *3 (Fla. Feb. 3, 2026) (finding records, standing alone, insufficient to support a claim under the *Baze/Glossip* standard or to warrant an evidentiary hearing); *Trotter v. State,* SC2026-0214, 2026 WL 444544 at *3 (Fla. Feb. 17, 2025) (same); Order, *Kearse v. State,* SC2026-0251 (Fla. Feb. 25, 2026) (denying appellant's motion to relinquish jurisdiction to allow filing of demands for public records or, in the alternative, for an order directing Defendants to immediately provide unredacted records concerning the executions of Ronald Heath and Melvin Trotter).

41.    In light of those rulings, absent Defendants' compliance with records requests, there is no way to ensure that the executions currently being carried out in the state are occurring in compliance with the protocol, and not with expired drugs, or incorrect dosages of drugs, or some other ad hoc deviation. Florida inmates are thus wholly foreclosed from adequately presenting a claim under *Baze/Glossip*. If Florida is violating the Eighth Amendment under those decisions, Defendants' actions have made it impossible for Mr. Taylor or this Court to discover it.

42.    Yet, there is sufficient evidence at this stage to merit discovery and further development. As one district court faced with a similar challenge observed, Mr. Taylor knows that "something is wrong with the State's implementation of its lethal injection protocol," but is at the frustrating juncture of not knowing what is

causing it. *Martin v. Emmons et al.*, No. 1:18-cv-4617-MLB, ECF No. 21 at 17 (N.D. Ga. Nov. 21, 2019) (denying the corrections defendant's motion for summary judgement in a facial challenge to Georgia's lethal injection protocol). Here, any speculation "lies in pondering what the wrong is, and that question may be something that Plaintiff can answer through discovery." *Id.*

43.    Dr. Zivot's conclusions support a legal basis for a cognizable Eighth Amendment claim. As Dr. Zivot opined, "[t]hese errors are significant and also contribute to the substantial likelihood of a drawn-out, torturous death." App. C at ¶ 7. As Dr. Zivot ultimately concluded:

> …FDOC is clearly approaching its execution method in a negligent manner. Like other states, FDOC suffers from a culture of secrecy. From my experience working as an expert in other states, I believe that better DOC systems are the product of more self-reflection. A well-functioning DOC would have intervened with corrections if similar errors in the administration of an execution protocol surfaced.

*Id.* at ¶ 12.

44.    The Constitution does not permit Defendants to impose barriers to the development of an Eighth Amendment claim by hiding documentation revealing the source, nature, and recurrence of the errors revealed in the troubling *Walls* records.

**A.    Defendants' narrow secrecy interest does not outweigh Mr. Taylor's Eighth Amendment protections.**

45.    The records requested by Mr. Taylor are discoverable and capable of being produced in a manner that would not violate any legitimate interest Defendants

have in secrecy. Indeed, the records requested by counsel are often produced without

incident.

46.    Fla. Stat. § 945.10(j)(1), amended by the legislature in 2022, protects:

(j)1.   Information or records that identify or could reasonably lead to the identification of any person or entity that participates in, has participated in, or will participate in an execution, including persons or entities administering, compounding, dispensing, distributing, maintaining, manufacturing, ordering, preparing, prescribing, providing, purchasing, or supplying drugs, chemicals, supplies or equipment necessary to conduct an execution in compliance with chapter 922.

§ 945.10(j)(1) Fla. Stat.

47.    Despite relying on this statute to justify categorical denials of all

records requests pertaining to the lethal injection protocol, Defendants violated

federal law through their decision to withhold *every* responsive document without

even attempting to show that this blanket response is necessary to protect the State's

limited secrecy interest, or that the State's interest outweighs Mr. Taylor's protected

liberty interest in an execution that comports with the Eighth Amendment.

48.    Defendants' reliance on Florida's secrecy statute is contradicted by its

own prior provision of records under the same statute. The *Walls* records contained

redacted inventory logs and even redacted invoices—this demonstrates that

Defendants are well aware that this information is capable of being provided without

sensitive information, like the identity of a supplier, becoming public.

49.    In fact, the records at issue, and more, were ordered to be produced in a separate ongoing suit in this district challenging the facial constitutionality of the execution protocol itself. *See* Order, *Brant*, No. 3:13-cv-412-MMH-SHJ (M.D. Fla. Jan. 2, 2024) (granting in part plaintiffs' motions to compel and ordering the production of various execution-related information). Importantly, the court in *Brant* ordered Defendants to produce the following, with appropriate redactions:

- Information relating to the manufacturer, pharmacy, vendor, and source of lethal injection drugs, and documents regarding the source, availability, and manufacturer information regarding the same;
- Lot numbers, quantities, expiration dates, logs, and inventories of execution drugs;
- Packaging related documents of lethal injection drugs;
- General information about the execution team training with personal, identifying information about individual execution team members redacted;
- General details about DOC's maintenance and storage of execution drugs;
- Copies of all local, state and federal licenses or registrations held by DOC or any DOC employee authorizing the procurement, purchase, possession or transfer of pharmaceuticals;
- Documents and information about efforts to obtain pentobarbital or compounded pentobarbital, between January 2017 and today;
- Prior execution logs and documents, and information related to the training of executioners involved in the executions of Mark Asay, Cary Lambrix, Patrick Hannon, Eric Branch, Jose Antonio Jimenez, Bobby Joe Long, and Gary Ray Bowles;

- Witness lists for the same executions, with redactions of identifying information for victims' family members;
- Information about the preparation and debriefings for the same executions.

*Id.*

50.    It is therefore nonsensical for Defendants to now claim that nothing at all can be produced under the pertinent provision of the secrecy statute. These types of records are certainly capable of being produced in response to lethal injection claims. *See Pizzuto v. Tewalt*, 136 F. 4th 855, 867-73 (9th Cir. 2025) (affirming district court's orders requiring Idaho Department of Corrections to share various pieces of information related to drug quality, including types and location of sources, and dates associated with purchase orders and testing results); *Martin*, No. 1:18-cv-4617, 2021 WL 1186749 at *5 (N.D. Ga. Mar. 30, 2021) (ordering Georgia Department of Corrections to disclose information about how chemicals were "created, stored, and transported" because the prisoner was "attacking the potency of Georgia's compounded pentobarbital."). In *Martin*, operating under a similar secrecy statute that protects the identity of execution suppliers, a compounding pharmacist involved in executions was deposed after the district court balanced Georgia's interest in "enforce[ing] its laws" against the "basic presumption…that the public is entitled to every person's evidence." *Id.* at *2, *9.

51.    In other states, similar information has become part of the public record without incident. *See Jordan et al. v. Fisher et al.*, No. 3:15-cv-00295-HTW-LGI,

21

ECF 310-18 (S. D. Miss. Jun. 4, 2025) (witness' chronology of Mississippi execution in the public record); *Pizzuto v. Derrick, et al.,* No. 1:21-cv-00359-BLW, ECF 183-6 (D. Id. Mar. 25, 2025) (chain of custody of Idaho lethal injection drugs in the public record); *Nance v. Oliver et al.,* No. 1:20-cv-00107-JPB, ECF 132 (N. D. Ga. May 16, 2024) (transcripts of depositions of Georgia execution team members in the public record); *Pizzuto,* ECF 102-10 (D. Id. Dec. 15, 2023) (Tennessee purchase orders of three drug protocol in the public record); *Id.,* ECF 102-9 (D. Id. Dec. 15, 2023) (Arizona purchase order of midazolam and hydromorphone in the public record); Petitioners' Original Verified Petition and Application for Temporary Injunction, Declaratory Relief, and Permanent Injunction, *Ruiz et al., v. Texas Dep't of Criminal Justice et. al.,* Case No. D-1-GN-22-007149, Travis County District Court (Dec. 14, 2022) (lab testing results, drug logs, and purchase order forms of Texas lethal injection drugs in the public record); *In re Federal Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-00145-TSC, ECF 69-1 (D. DC Jan. 14, 2020) (certificate of analysis of federal government's supply of compounded pentobarbital in the public record); *Gray v. McAuliffe et al.*, No. 3:16-cv-982-HEH, ECF 21 (E.D. Va. Dec. 23, 2016) (lethal injection drug labels, certificate of analyses, and package inserts for Virginia lethal injection drugs in the public record).

52.    Florida's interest in secrecy is not somehow stronger than any other state—particularly when Defendants have complied with releasing this information in the past and are currently doing so in another suit pending in this district.

**B.    Defendants' Refusal to Provide Any Records Despite the Evidence of Repeated Maladministration Violates Due Process**

53.    Defendants' obstructionist position that not a single word of DOC's execution records would be responsive under Florida's secrecy statute—a position it only began taking after records demonstrating their own negligence came to light—is untenable and unsupported by law. This instant challenge is therefore not a challenge to Florida's secrecy act on its own, but rather to Defendants' newfound, and unconstitutional, interpretation of it.

54.    As observed by Justice Sotomayor in a recent statement in *Trotter v. State*, "disclosure of the relevant records is indispensable for determining whether the lapses at issue are likely to lead to an Eighth Amendment violation." 2026 WL 504237 at *2 (citing *Smith v. Hamm*, 601 U.S. -- (2024) (Kagan, J., dissenting from denial of application for stay and denial of certiorari) (suggesting that the Court's Eighth Amendment precedents "can work fairly only when more is capable of being known about an execution method.").

55.    The Eighth Amendment is rendered meaningless if death-sentenced prisoners are denied a fair opportunity to challenge how the state intends to kill them. *See Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170 (1951)

(Frankfurter, J., concurring) (protecting the "elementary rights of men" requires "fairness" and "[a]n opportunity to be heard"). The Eighth Amendment therefore relies on the Fifth and Fourteenth Amendments to ensure dignity in capital punishment.

56.    In *Ford v. Wainwright*, 477 U.S. 399, 417-18 (1986), the Supreme Court held that the Eighth Amendment's prohibition against the execution of the insane entitled Mr. Ford to adequate procedures for determining his sanity. Noting that "[t]he fundamental requisite of due process of law is the opportunity to be heard," the Court found that:

> [C]onsistent with the heightened concern for fairness and accuracy that has characterized our review of the process requisite to the taking of a human life, we believe that any procedure that precludes the prisoner or his counsel from presenting material relevant to his [Eighth Amendment claim] or bars consideration of that material by the factfinder is necessarily inadequate. The minimum assurance that the life-and-death guess will be a truly informed guess requires respect for the basic ingredient of due process, namely, an opportunity to be allowed to substantiate a claim before it is rejected.

*Id*. at 414 (internal quotations omitted).

57.    Similarly, Florida cannot execute Mr. Taylor under the current iteration of the protocol without first affording him due process of law in a challenge to Defendant's maladministration. *See* U.S. Cont. Amend. V ("No person shall…be deprived of *life*, liberty, or property, without due process of law…"); *see also Adams v. United States ex rel. McCan*, 317 U.S. 269, 276 (1942) ("procedural devices rooted

in experience were written into the Bill of Rights not as abstract rubrics in an elegant code but in order to assure fairness and justice before any person could be deprived of 'life, liberty, or property.'").

58.    As discussed in more detail in the accompanying memorandum of law, the Supreme Court has put forth a two-step framework for examining procedural due process claims. *Goldberg v. Kelly*, 397 U.S. 254, 262-63 (1970) ("The extent to which due process must be afforded the [individual] is influenced by the extent to which he may be condemned to suffer grievous loss… and depends on whether the [individual]'s interest in avoiding that loss outweighs the governmental interest [at stake.]." Application of that test to Mr. Taylor's claim should result in relief.

59.    Where, as here, Mr. Taylor ultimately stands to suffer the greatest loss of all—that of his life—and where, as here, the State's interest in secrecy does not support the blanket refusal to produce *any* further documentation regarding its repeated maladministration of its lethal injection protocol, there has been a violation of federal due process that requires this Court's intervention.

## VI.    REQUEST FOR RELIEF

WHEREFORE, Mr. Taylor respectfully requests that this Court:

a)    Enter a declaratory judgment under 42 U.S.C. § 1983 finding that executing Mr. Taylor without affording him adequate process to investigate the

documented and repeated maladministration of the lethal injection protocol will violate his rights under the Fifth, Eighth, and Fourteenth Amendments;

b)    Enter injunctive relief to prevent Defendants from executing Mr. Taylor without first providing sufficient reassurance that the errors have been investigated, corrected, and will not recur;

c)    Order discovery and an evidentiary hearing; and

d)    Grant any other relief this Court finds just and proper.

## VII.   CERTIFICATION

Linda McDermott, attorney for Mr. Taylor, certifies that, to the best of her knowledge and belief, the facts set forth in this complaint are true and correct.

Respectfully submitted,

/s/ Linda McDermott
LINDA MCDERMOTT
        Chief, Capital Habeas Unit
SEAN GUNN
Federal Public Defender
Northern District of Florida
227 N. Bronough St., Suite 4200
Tallahassee, FL 32301
(850) 942-8818
linda_mcdermott@fd.org

*Counsel for Mr. Taylor*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing pleading has been furnished by electronic mail to counsel for the Defendants, the Office of the Attorney General. Service will be completed upon issuance of the summons.

<u>/s/ Linda McDermott</u>
LINDA MCDERMOTT